**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| TAMARA GOUCHER, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT – CLASS ACTION** |
| ALL CHILDREN'S HEALTH SYSTEM, INC.; THE RETIREMENT PLAN COMMITTEE OF ALL CHILDREN'S HEALTH SYSTEM, INC.; TRANSAMERICA RETIREMENT SOLUTIONS, LLC; and CREATIVE PLANNING, LLC, | |
| Defendants. | |

**INTRODUCTION**

1. Plaintiff Tamara Goucher devoted her career to serving children in need at the Johns Hopkins All Children's Hospital. Her employer, All Children's Health System, Inc. ("All Children"), created two retirement plans for its employees. Both were governed by the Employee Retirement Income Security Act of 1975 ("ERISA") and managed by plan fiduciaries. These fiduciaries breached their duties under ERISA. They did so by constructing an investment menu that did not fit the plans' objectives, leading to massive lost savings for participants.

2. The two plans at issue are the All Children's Health Systems, Inc. 403(b) Savings Plan ( "403(b) Plan") and the Retirement Plan for Employees of All Children's Health System, Inc. ("401(a) Plan") (collectively, the "Plans"). Plaintiff sues on behalf of herself and other Plan participants harmed by the fiduciaries' poor investment options ("Class Members").

3.      In choosing investments, ERISA requires fiduciaries to act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" to be expected of a prudent fiduciary, *id*., § 1104(a)(1)(B).

4.      Each Defendant acted as a Plan fiduciary subject to these duties.

5.      All Children is the Plans' administrator and owner of All Children's Hospital. The hospital is a pediatric acute care provider affiliated with the Johns Hopkins School of Medicine. Over 6,000 current or former employees of the hospital participated in the Plans. After creating the Plans, All Children delegated its investment duties to an internal body, The Retirement Plan Committee of All Children's Health System, Inc. ("Committee").

6.      All Children also hired two external investment professionals. One was the Plans' investment manager, Transamerica Retirement Solutions, LLC ("Transamerica"). Transamerica also provided the Plans' recordkeeping and administrative ("RKA") services. For the 403(b) Plan, All Children hired an investment advisor, Creative Planning, LLC ("Creative").

7.      The Committee, Transamerica, and Creative are co-fiduciaries and proper Defendants. Each Defendant exercised "authority or control respecting management or disposition of [the Plan's] assets." 29 U.S.C. § 1002(21)(A).

8.      The Plans here are defined contribution plans. In such plans, a fiduciary constructs a menu of investment options for the plan participants. "Although the defined contribution scheme allocates some power to participants, a fiduciary's menu construction is still important because poor menu construction 'leads to predictably worse outcomes for investors.'" *Stegemann v. Gannett Co., Inc.,* 970 F.3d 465, 469 n.3 (4th Cir. 2020) (quoting Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L. J. 1476, 1507 (2015)).

9. To protect participants, ERISA charges fiduciaries with "a continuing duty to monitor trust investments and remove imprudent ones . . . . If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022) (internal citation omitted).

10. From 2015 to 2025, Defendants steered a large chunk of the Plan's assets into a single asset series: the American Century One Choice Target Date Funds ("American Century Trust TDFs"). These funds were not suitable for the Class Members' time horizons or the Plans' long term investment objective.

11. A target date fund ("TDF") is a "fund of funds" matched to a specific retirement year. A TDF invests in underlying mutual funds that, in turn, manage portfolios of equities (stocks), fixed-income (bonds), and other assets. American Century's TDFs primarily invest in mutual funds owned by American Century.

12. TDFs are designed to gradually shift their mix of stocks, bonds, and other assets over time. As the target year approaches, they shift toward less stocks and more bonds.

13. These allocation shifts are a fund's "glide path." "Glide paths in retirement funds come in two main types: 'to' and 'through.' 'To' glide paths reach their most conservative allocation at the target retirement date and stay there, while 'through' glide paths continue to adjust and become more conservative for several years after the retirement date." *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 210 (6th Cir. 2024).

14. The American Century TDFs follow a "to" glide path, but one that is unusually flat and bond-heavy at all stages along the path. Morningstar explains, "[t]his series has one of the

flattest glide paths in the industry. . . . Hence, the series' exposure to stocks . . . remains below the peer average until it lands at 45% at retirement."[1]

15.     Defendants admitted this ultra-flat glide path was a "major detractor" to growth. Even so, they failed to replace the American Century TDFs until long after making this admission. They provided no other TDF option to Plan participants until September 2025. A prudent fiduciary would have done so no later than 2020 or 2021.

16.     At the start of the Class Period (June 2020 to present), more than one third of the Plan's assets were invested in the American Century TDFs. Defendants provided no other target date option until September 2025. The Plan invested in each of the following target year vintages of the American Century TDFs:

- American Century One Choice 2025 Class I
- American Century One Choice 2030 Class I
- American Century One Choice 2035 Class I
- American Century One Choice 2040 Class I
- American Century One Choice 2045 Class I
- American Century One Choice 2050 Class I
- American Century In Retirement Class I

17.     Defendants chose the American Century TDFs as the Plan's Qualified Default Investment Alternative ("QDIA"). A QDIA is the asset employees are enrolled in automatically if they make no investment selection. Usually, a target date option acts as a plan's QDIA. It is typical for participants to invest their entire retirement assets in a single TDF that tracks their retirement date. This creates a heightened duty for fiduciaries to choose a suitable TDF option.

---

[1] https://www.morningstar.com/funds/xnas/arcvx/analysis.

4

18. No later than 2020 or 2021, a prudent fiduciary would have noticed the American Century TDFs' failure to match their peer group's returns or the Plans' investment objectives. By retaining them until September 2025, Defendants breached their duties of prudence and loyalty.

19. Lastly, Defendants breached their duties of loyalty and prudence by causing the Plan to invest in higher-cost shares of various funds despite the availability of lower-cost shares. The Plan's broker, National Financial Services ("National"), collected excessive revenue-sharing kickbacks from these mutual funds. It then passed the excessive revenue-sharing fees on to Transamerica, the Plan's recordkeeper and investment manager. These arrangements were party-in-interest transactions, prohibited by 29 U.S.C. § 1106(a)(1).

20. Plaintiff Tamara Goucher is a participant in the 403(b) Plan. She has worked at All Children's Hospital for over 30 years. Like other Class Members, Plaintiff was harmed by Defendants' selection of the American Century TDFs as the Plan's sole target date option and default investment.

21. Through their imprudent process, Defendants inflicted harm on Plaintiff and other participants in the Plans who invested in the mutual funds challenged below ("Class Members"). The specific violations and harms include:

- **Prudence – Selection of American Century Trust TDFs:** The Committee, Transamerica, and Creative selected the entire suite of American Century TDFs, despite their underperformance and failure to meet the Plans' stated investment objective.

- **Prudence - Failure to Monitor American Century Trust TDFs:** The Committee, Transamerica, and Creative retained the American Century Trust TDFs even after they received downgraded Morningstar ratings and were increasingly abandoned by prudent 401(k) plans.

- **Prudence – Selection of More Expensive Share Class:** The Committee, Transamerica, and Creative chose more expensive shares of the American Century

TDFs, the PIMCO Income Fund, the Janus Henderson Triton Fund, and the Invesco Developing Markets Fund, despite the availability of lower-cost shares. These choices inflicted unnecessary costs on Class Members.

- **Prudence – Failure to Monitor Delegation:** All Children failed to adequately monitor its co-fiduciaries, the Committee, Transamerica, and Creative, to ensure they were performing their duties and acting in the best interest of Plan participants.

- **Loyalty – Prohibited Transactions:** By causing the Plan to invest in more expensive share classes of the American Century, PIMCO, Janus Henderson, and Invesco Emerging Market Funds, Defendants breached their duty of loyalty. These choices were made because the funds kicked back revenue-sharing fees to the Plan's broker, National, who passed the fees to Transamerica, a Plan fiduciary. These were party-in-interest transactions, prohibited by 29 U.S.C. § 1106(a)(1).

22.     Plaintiff and Class Members are entitled to recover losses to the Plans, including the difference between the value of their accounts as they exist today and the value the accounts would have but for Defendants' violations of ERISA.

23.     Before filing this lawsuit, Plaintiff reviewed documents establishing the Plan's claims procedure under ERISA §503 (29 U.S.C § 1133). The Plan documents only require pre-suit claims procedures for contractual "claims for benefits," not statutory claims.

## JURISDICTION AND VENUE

24.     Plaintiff brings this action under 29 U.S.C. §§ 1132(a)(2), (3). These sections allow plan participants to sue on behalf of ERISA plans to remedy breaches of duty and to obtain appropriate equitable and monetary relief under 29 U.S.C. § 1109.

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this case presents a federal question arising under ERISA.

26.     Under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), venue is proper because All Children maintains its principal place of business in this district and regularly conducts business in this district. Among other things, this district is where Defendants carried out the acts and practices that give rise to this case.

## **PARTIES**

27.     Plaintiff Tamara Goucher is a citizen and resident of Florida and is a participant in the 403(b) Plan.

28.     In reliance on the investment options offered by Defendants, Plaintiff invested her retirement savings in the American Century One Choice 2030 Class I TDF and the PIMCO Fund Class A.

29.     The Class Members consist of other plan participants in the Plans who, during the Class Period, held any of the American Century TDFs, the PIMCO Fund, or the Janus Triton Fund.

30.     Defendant All Children is a corporation with its principal office located in Florida. All Children's primary facility is the All Children's Hospital, located in St. Petersburg, Florida.

31.     Defendant the Committee is a committee appointed by All Children to assume investment responsibility as to the Plans. On information and belief, the Committee has no separate corporate existence from All Children.

32.     Defendant Transamerica is a Delaware company.

33.     Defendant Creative is a wealth management firm headquartered in Kansas.

34.     All Children is the "plan sponsor" of the Plans under 29 U.S.C. § 1002(16)(B).

35.     The Plans are "employee pension benefit plans," 29 U.S.C. § 1002(2)(A), and "defined contribution plans," 29 U.S.C. § 1002(34).

36.     Plaintiff has standing to represent both Plans because they were managed by the same fiduciaries and invested in the same imprudent assets.

37.     In April 2023, the 401(a) Plan merged into the 403(b) Plan, transferring its remaining assets and active participants.

38.     The Committee, Transamerica, and Creative are responsible for selecting, monitoring, and removing investment options for the Plans.

## **LEGAL BACKGROUND**

39.     ERISA imposes strict fiduciary duties of prudence upon All Children as a fiduciary of the Plans. These duties are "derived from the common law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). So, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.*

40.     The duty of prudence appears, among other places, in the following statutory text:

A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

A.  for the exclusive purpose of:

   i.  providing benefits to participants and their beneficiaries; and

   ii.  defraying reasonable expenses of administering the plan;

B.  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

C.  by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

D.  in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a)(1).

41.    ERISA similarly imports the trust law duty of loyalty by stating that fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

42.    To supplement the duty of loyalty, ERISA prohibits certain transactions between the plan and any party-in-interest:

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

29 U.S.C. § 1106(a).

43.    These duties apply to Defendants' actions, discussed below.

## **FACTUAL ALLEGATIONS**

44.    During the Class Period, Defendants failed to follow the Plans' Investment Policy Statement ("IPS"). The Committee adopted an IPS governing both Plans in September 2020. It amended the Plans' IPS in May 2023 and September 2025. Each IPS identified the Plans' investment objectives and set criteria to consider in pursuing those objectives.

45.    Until September 2025, the IPS's objectives included "[m]aximiz[ing] return within reasonable and prudent levels of risk," "[p]rovid[ing] returns comparable to similar investment options," and "[c]ontrol[ling] administrative and management costs."

46.     The IPS also provided criteria for selecting the right target date option to meet these objectives. It stated that Defendants should compare "how [a TDF's] asset allocation compares to industry standards for each age group."

47.     Defendants chose assets that were incompatible with the IPS's objective. That is, they caused the Plans to retain the American Century TDFs from 2015-2025. Defendants knew these TDFs used an ultra-flat glide path that inhibited growth compared to peers.

48.     Defendants also failed to control costs when selecting mutual funds. Their high-priced share classes resulted in excessive revenue-sharing payments to insiders, including Defendant Transamerica.

49.     The allegations below are supported by All Children's Form 5500 filings with the U.S. Department of Labor ("DOL"), its IPS, and other documents.

**A. Defendants Imprudently Select the American Century Trust TDFs and Fail to Remove Them for Over a Decade.**

1.   Background on the Plan's selection of American Century TDFs.

50.     Over the past 15 years, the investment industry saw an explosion of target date options. By 2019, the target date market exceeded $2 trillion in total assets. No later than 2020, a fiduciary could review more than a decade of performance history for dozens of options.[2]

51.     Still, most ERISA fiduciaries converged on a few default options. By 2020, 78% of the target date market share was dominated by five providers: T. Rowe Price, Vanguard, Fidelity, BlackRock, and the American Funds. They remain dominant today.

52.     In 2015, Defendants chose to add a target date option to the 403(b) Plan. Instead of choosing a conventional option, Defendants opted for the American Century TDFs.

---

[2] https://www.morningstar.com/funds/target-date-funds-have-delivered-investors (identifying 37 target date options that existed before the year 2010).

53.    Over the next decade, Defendants doubled down on this choice. In 2016, they caused the 403(b) Plan to add American Century's new TDF for target year 2060. In 2021, they added these TDFs to the 401(a) Plan. And in 2023, when the 401(a) Plan merged into the 403(b) Plan, Defendants retained the American Century TDFs as the default option. Defendants provided no other target date options during this time.

54.    Defendants finally replaced the American Century TDFs in September 2025. They chose the BlackRock TDFs, one of the five most popular market options.

55.    A prudent fiduciary would have made that switch years earlier. Had Defendants done so, the Plans would be worth tens of millions more dollars today.

2.    <u>A prudent fiduciary would have compared the American Century TDFs to the entire target date market, as All Children's IPS required</u>.

56.    When choosing investment options, an ERISA fiduciary must use "appropriate investment horizons consistent with the plan's investment objectives." 29 C.F.R. § 2550.404a-1 (Jan. 15, 2021). "[T]ime horizon is the number of months, years, or decades you need to invest to achieve your financial goal."[3] Generally, longer time horizons require a focus on growth; shorter horizons demand more stability in downturns.

57.    Most 401(k) participants plan to use their savings to support their retirement years. The number of expected post-retirement years impacts their time horizon. All Class Members here are "U.S. healthcare workers," who, statistically, have "longer life expectancy . . . than other workers."[4] Longer life expectancy implies a longer time horizon.

58.    Until September 2025, the Plans' IPS acknowledged the need to consider time horizon in selecting an investment objective. The IPS instructed Defendants to review "[h]ow asset

---

[3] https://www.investor.gov/introduction-investing/investing-basics/glossary/time-horizon.

[4] https://pubmed.ncbi.nlm.nih.gov/39612966/.

allocation compares to industry standards for each age group," participants "age, target retirement date, or life expectancy," and the need for "long-term appreciation."

59. These criteria informed the IPS's investment objectives. Before September 2025, the IPS required a focus on "[m]aximiz[ing] return within reasonable and prudent levels of risk" and "[p]rovid[ing] returns comparable to similar investment options." These were sensible objectives for the Plan and the Class Members.

60. To achieve these objectives, the 2020 and 2023 versions of the IPS required "comprehensive analysis of Plan investment options versus benchmark and peer group." The IPS instructed fiduciaries to "[i]dentify underperforming investments, including search and selection of replacement and additional options for the Plans."

61. Defendants failed to follow the IPS's investment objectives or processess. They provided no target date alternative to the American Century TDFs, despite knowing these funds used a much "[f]latter glide path" than most. Defendants admitted this unusual glide path "was a major detractor" in growth markets.

62. At the start of the Class Period (2020-2021), the American Century TDFs' ten-year returns lagged all five of the most popular TDF options: T. Rowe Price, Vanguard, Fidelity, the American Funds, and BlackRock.

63. This comparison is proper and would have been made by any prudent fiduciary. These five funds pursued the same objectives as American Century, invested predominantly in stock and bond-based assets, and were available to the Plan during the Class Period. Together, these five funds made up about 80% of the market at all relevant times.

64. This comparison is not a product of hindsight. Since at least 2013, the DOL has advised ERISA fiduciaries to "[e]stablish a process for comparing and selecting TDFs." This

12

process "should consider prospectus information, such as information about performance (investment returns) and investment fees and expenses."[5]

65.    It is also appropriate to compare American Century's TDFs to peers that follow both "to" glide paths (like BlackRock) and "through" glide paths (T. Rowe Price, American Funds). These glide paths are just different ways to balance short-term stability (more bonds) against long-term income security (more stocks). The right approach turns on factors such as the plan's investment objective and the participants' time horizons.

66.    In 2021, an investment professional explained that "[m]anagers of 'through' TDFs tend to have a primary focus on creating income throughout retirement . . . . Most managers of 'to' TDFs have the objective of limiting portfolio volatility up to retirement as the primary goal, and the income throughout retirement is more of a secondary objective."[6]

67.    The same article added: "The retirement industry previously perceived 'to' glide paths as more conservative than 'through' ones, but . . . the market volatility of [COVID] helped to debunk this myth. That was evident [in 2020], when we realized 'to' vs. 'through' doesn't define the volatility of the fund . . . . 'It was underlying securities and management [that did].'"[7]

68.    By 2021, the retirement industry discussed how "[f]ocusing on short-term risk," as "to" glide paths often do, "can have lasting impacts on longevity risk."[8] For most retirement savers, "[v]olatility risk" is "rarely catastrophic due to its short-term nature. . . . However, longevity risk

---

[5] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds-erisa-plan-fiduciaries-tips.pdf.

[6] https://www.plansponsor.com/in-depth/evaluating-vs-glide-paths/.

[7] *Id*.

[8] *Id*.

is a lasting problem—a participant who runs out of retirement income at age 80 or 85 will experience devastating consequences."[9]

69.    This longstanding observation has been confirmed by research. A report by Fidelity "shows that in 74% of simulated macroeconomic environments, the accumulated wealth at the target date (age 65) was higher with a Through glide path than with [a] To glide path. The advantage of Through glide paths is asymmetrical as it adds more years of income in retirement during normal and strong equity markets than it detracts during weak equity markets."[10]

70.    Put simply, "to" glide paths add some stability in downturns but can lead to much greater lost earnings at other times. For a beneficiary with a long time horizon, underinvestment today creates longevity risk in retirement years.

71.    This observation is not new. Fiduciaries have long known that "investment activities must be sensitive to the competition between the needs of the present and the needs of the future." Edward C. Halbach, Jr., *Trust Investment Law in the Third Restatement*, 77 Iowa L. Rev. 1151, 1172 (1992). "'[P]reservation' of trust capital" includes the goal of guarding "income flow over the years." *Id*.

72.    If a fiduciary throws away long-term growth for a small cushion in downturns, that decision must be justified by unique circumstances (e.g., older participant population, below average life expectancy, a plan with no ongoing contributions, or large and immediate liquidity needs). For most plans, such a tradeoff is not "conservative" but reckless.

73.    By 2007, the Restatement of Trusts highlighted this issue. Using the example of a "long-term strategy of investing . . . in short-term" bonds, it warned, "[a]lthough in a sense

---

[9] *Id*.

[10] https://institutional.fidelity.ca/en/insights/through_vs_to/.

cautious, this investment program would ordinarily be viewed as failing to take adequate account of the fiduciary duty of caution as it applies to safeguarding the real value of capital, and even of protecting [beneficiaries'] longer-range interests with respect to income." Restatement (Third) of Trusts § 90, illus. 11 (2007).

74.     The Restatement explained that "[t]he amount and stability of income are important considerations in investing," "but so is preservation of the trust estate." *Id*. And "the latter objective ordinarily includes protecting . . . [the beneficiary's] income stream . . . over [the beneficiary's] lifetime." *Id*. Fiduciaries must manage this tradeoff by "incorporat[ing] risk and return objectives reasonably suitable to the trust." *Id*. Absent special circumstances, a fiduciary must place its "emphasis on long-term investing." *Id*.

75.     During the Class Period, reasonable fiduciaries understood their duty to balance short and long-term needs. This led most plans to choose "through" glide paths due to their greater tendency towards long term appreciation.

76.     By 2024, 73% of TDFs became "through" funds "that continue to change their allocations for up to 30 years after the target date, while the remainder [were] 'to' funds with allocations that no longer change after the target date."[11]

77.     The Plans here faced no special circumstances justifying a flatter glide path. The Class Members are healthcare workers with longer than average life expectancies. And the Plans' IPS identified only minimal liquidity needs. During the Class Period, the 401(a) Plan reported no loans to participants; the 403(b) Plan reported fewer loans than most plans, suggesting below average liquidity needs. Given these facts and circumstances, a prudent fiduciary would focus more on long term growth than on slightly reducing short-term volatility.

---

[11] https://www.ici.org/system/files/2025-12/25-ici-quick-facts-target-date-funds.pdf.

78.    Before September 2025, the Plan's IPS required a growth-oriented investment style. Its stated objectives included the following:

- "[m]aximiz[ing] return within reasonable and prudent levels of risk,"

- ensuring "returns [were] comparable to similar investment options," and

- "provid[ing] long-term appreciation" based on participants' "age, target retirement date, or life expectancy."

79.    For a plan with these investment objectives, large investment gains should not be discarded just to slightly reduce volatility in downturns.

80.    Defendants knew the American Century TDFs imposed exactly this tradeoff. They knew these funds employed a "flatter glide path." They also knew the flatter glide path was a "major detractor" in market rallies.

81.    In the decade before the Class Period began, the American Century TDFs' "downside protection" paled next to their drag on growth at other times. As shown below, their long-term returns remained far behind the five largest TDF providers—T. Rowe Price, Fidelity, American Funds, Vanguard, and BlackRock.

    3.    <u>The American Century TDFs underperformed throughout the Class Period, resulting in massive lost earnings.</u>

82.    By 2021, a decade of performance data was available for most TDFs. A reasonable fiduciary would have compared the American Century TDFs' history to that of their five peers that dominated the market: T. Rowe Price, Vanguard, Fidelity, American Funds, and BlackRock.

83.    T. Rowe Price is a good yardstick. Like American Century, the T. Rowe Price TDFs invested in stocks and bond-based mutual funds, using an active management approach. By 2021,

"T. Rowe Price [was] the largest manager of active target date products in the U.S., with $327.3 billion in active target date strategy assets under management, as of March 31, 2021."[12]

84.    In 2021, a reasonable fiduciary would have noticed the ten-year performance gap between American Century and T. Rowe Price, starting with their 2025 vintages.

*2012–2021: American Century 2025 TDF Returns.*



*2012– 2021: T. Rowe Price Retirement 2025 TDF Returns.*



85.    In 2021 or 2022, any reasonable fiduciary reviewing this data would have grasped that over ten years (2012-2021), the American Century 2025 TDF underperformed its T. Rowe

---

[12] https://401kspecialistmag.com/t-rowe-price-lowers-tdf-expenses-introduces-retirement-blend-fund-series/.

Price counterpart by 26.39%. And in 2021, a fiduciary reviewing this data would have noticed that the American Century fund had underperformed by about 24% over nine years (2012-2020).

86. This comparative exercise would have led to the same conclusion as to other vintages in 2021 or 2022. The available data is shown below as to vintages ranging from target year 2030 to target year 2065.

*2012–2021: American Century 2030 TDF Returns.*



*2012–2021: T. Rowe Price Retirement 2030 TDF Returns.*



Over ten years, the American Century 2035 TDF underperformed its T. Rowe Price counterpart by 28.56%.

*2012–2021: American Century 2035 TDF Returns.*



*2012– 2021: T. Rowe Price Retirement 2035 TDF Returns.*



Over ten years, the American Century 2035 TDF underperformed its T. Rowe Price counterpart by a cumulative 28.20%.

*2012–2021: American Century 2040 TDF Returns.*



*2012– 2021: T. Rowe Price Retirement 2040 TDF Returns.*



Over ten years, the American Century 2040 TDF underperformed its T. Rowe Price counterpart by a cumulative 26.18%.

*2012–2021: American Century 2045 TDF Returns.*



*2012–2021: T. Rowe Price Retirement 2045 TDF Returns.*



Over ten years, the American Century 2045 TDF underperformed the T. Rowe Price counterpart by a cumulative 21.60%.

*2012– 2021: American Century 2050 TDF Returns.*



*2012–2021: T. Rowe Price 2050 TDF Returns.*



Over ten years, the American Century 2050 TDF underperformed its T. Rowe Price counterpart by a cumulative 16.56%.

*2012–2021: American Century 2055 TDF Returns.*



*2012–2021: T. Rowe Price Retirement 2055 TDF Returns.*



Over ten years, the American Century 2055 TDF underperformed its T. Rowe Price counterpart by a cumulative 13.67%.

87. In 2016, American Century created a TDF with a target date year of 2060. Given the history above, a reasonable fiduciary would have hesitated before adding this new fund. Defendant failed to exercise such caution.

88. By 2017, Defendants steered over $2 million in Plan assets into the American Century Trust 2060 TDF. This decision led to swift, predictable losses for Class Members' retirement savings. Over each of the next five years, the American Century 2060 Trust TDF failed

to match its T. Rowe Price counterpart. As of 2021-2022, the data below was available to Defendants.

*2016–2021: American Century 2060 TDF Returns.*



*2016–2021: T. Rowe Price Retirement 2060 TDF Returns.*



Over six years, the American Century 2060 TDF underperformed its T. Rowe Price equivalent by a cumulative 7.35%.

89.    The chart below summarizes the comparative data that would have been available to a reasonable fiduciary in 2021 or 2022, looking back from a five-year to ten-year perspective.

24

*2012-2021: American Century TDFs Underperformance Versus T. Rowe Price Retirement TDFs*

| Vintage | Years Analyzed | Total Underperformance | Years Underperformed |
|---|---|---|---|
| 2025 | 2012-2021 | 26.39% | 8 of 10 |
| 2030 | 2012-2021 | 28.56% | 8 of 10 |
| 2035 | 2012-2021 | 28.20% | 8 of 10 |
| 2040 | 2012-2021 | 26.18% | 8 of 10 |
| 2045 | 2012-2021 | 21.60% | 8 of 10 |
| 2050 | 2012-2021 | 16.56% | 9 of 10 |
| 2055 | 2012-2021 | 13.67% | 9 of 10 |
| 2060 | 2016-2021 | 7.35% | 5 of 6 |

90.     Across all target year vintages above, the American Century TDFs lagged the T. Rowe Price Retirement TDFs over the decade from 2012-2021 (or, for the 2060 vintage, from 2016-2021). Their average underperformance was 21.06%; the median was 23.89%.

91.     In 2021, both American Century and T. Rowe Price established TDFs with a target year of 2065. Both offered collective trust versions of their 2065 funds.

92.     By the time these 2065 funds appeared, the American Century TDFs had recorded a full decade of performance data. Defendants should have reviewed this history and exercised caution before selecting another American Century TDF. But the Committee, Transamerica, and Creative exercised no such restraint. They forced the American Century 2065 TDF into the Plan's menu the first year it became an option.

93.    By the end of 2021, this 2065 vintage continued American Century's pattern of lagging its peers:

*2021: American Century 2065 TDF Returns.*



*2021: T. Rowe Price 2065 TDF Returns.*



In just one year, the American Century 2065 TDF underperformed its T. Rowe Price peer by nearly 4%.

94.    Aside from T. Rowe Price, the most popular target date options in 2020-2021 were Vanguard, American Funds, and Fidelity.[13] The American Century Trust TDFs lagged each of these over the same decade (2012-2021).

95.    At all times, Vanguard's TDFs were the most popular target date option nationwide, tending to account for more than 30% of the market. They are passively managed and seek to track a target date index. By 2021, Defendants could have observed the American Century TDFs' poor track record compared to Vanguard, as shown below:

*2012-2021: American Century TDFs Underperformance Versus Vanguard TDFs*

| Target Year Vintage | Years Analyzed | Total Underperformance | Years Underperformed |
|---|---|---|---|
| 2025 | 2012-2021 | 15.56% | 9 of 10 |
| 2030 | 2012-2021 | 16.76% | 8 of 10 |
| 2035 | 2012-2021 | 17.26% | 7 of 10 |
| 2040 | 2012-2021 | 16.38% | 7 of 10 |
| 2045 | 2012-2021 | 13.30% | 6 of 10 |
| 2050 | 2012-2021 | 8.51% | 7 of 10 |
| 2055 | 2012-2021 | 5.68% | 7 of 10 |
| 2060 | 2016-2021 | 3.80% | 5 of 6 |
| 2065 | 2021 | 1.91% | 1 of 1 |

96.    For the period of 2012-2021, an even larger gap separated the American Century TDFs from Capital Group's actively-managed series, the American Funds TDFs. The American Funds TDFs were the fifth most popular TDF nationwide, with about 8% market share.

---

[13] https://www.morningstar.com/funds/target-date-fund-flows-bounce-back-2021.

97.     Compared to the American Funds' performance over this decade, the American Century TDFs fell behind by varying degrees, ranging from 20.97% (2050 vintage) to 32.88% (2030 vintage).

*2012-2021: American Century TDFs Underperformance Versus American Funds TDFs*

| Target Year Vintage | Years Analyzed | Total Underperformance | Years Underperformed |
|---|---|---|---|
| 2025 | 2012-2021 | 25.10% | 9 of 10 |
| 2030 | 2012-2021 | 24.42% | 9 of 10 |
| 2035 | 2012-2021 | 32.88% | 9 of 10 |
| 2040 | 2012-2021 | 25.26% | 9 of 10 |
| 2045 | 2012-2021 | 25.26% | 8 of 10 |
| 2050 | 2012-2021 | 20.97% | 9 of 10 |
| 2055 | 2012-2021 | 21.84% | 9 of 10 |
| 2060 | 2016-2021 | 10.65% | 6 of 6 |
| 2065 | 2021 | 2.77% | 1 of 1 |

98.     Nor could the American Century TDFs keep pace with the actively-managed Fidelity Freedom TDFs. Between these two competitors, American Century's performance gap is shown below.

*2012-2021: American Century TDFs Underperformance Versus Fidelity Freedom TDFs*

| Target Year Vintage | Years Analyzed | Total Underperformance | Years Underperformed |
|---|---|---|---|
| 2025 | 2012-2021 | 6.59% | 8 of 10 |
| 2030 | 2012-2021 | 12.45% | 8 of 10 |
| 2035 | 2012-2021 | 16.80% | 8 of 10 |
| 2040 | 2012-2021 | 13.56% | 7 of 10 |
| 2045 | 2012-2021 | 11.05% | 6 of 10 |
| 2050 | 2012-2021 | 6.71% | 6 of 10 |

| 2055 | 2012-2021 | 1.42% | 5 of 10 |
| 2060 | 2016-2021 | 4.29% | 5 of 6 |
| 2065 | 2021 | 1.18% | 1 of 1 |

99.     For a final comparison, the American Century TDFs spent the same decade trailing the most popular "to" glide path TDF, BlackRock's LifePath Dynamic series. By the end of 2021, a fiduciary reviewing the past decade would have seen performance gaps ranging from a ten-year low of 4.99% (2025 vintage) to a high of 15.06% (2040 vintage).

| Target Year Vintage | Years Analyzed | Total Underperformance | Years Underperformed |
| --- | --- | --- | --- |
| 2025 | 2012-2021 | 4.99% | 6 of 10 |
| 2030 | 2012-2021 | 11.46% | 7 of 10 |
| 2035 | 2012-2021 | 13.92% | 5 of 10 |
| 2040 | 2012-2021 | 15.06% | 5 of 10 |
| 2045 | 2012-2021 | 11.70% | 5 of 10 |
| 2050 | 2012-2021 | 8.60% | 5 of 10 |
| 2055 | 2012-2021 | 7.96% | 5 of 10 |
| 2060 | 2018-2021 | 4.33% | 2 of 4 |
| 2065 | 2021 | 3.88% | 1 of 1 |

100.    This comparison is especially troubling. In September 2025, long after admitting the American Century TDFs had underperformed, Defendants replaced them with the BlackRock LifePath TDFs. A prudent fiduciary would have made this switch in 2020, 2021, or 2022, based on the trailing ten-year data in the chart above.

101.    The same month, Defendants paired this fund change with sweeping edits to the 403(b) Plan's IPS. In September 2025, Defendants deleted the IPS's investment objectives— "long-term appreciation," "[m]aximiz[ing] return," and seeking "returns comparable to similar

investment options." They substituted in new language, approving "investment choices" that "provide for a high degree of safety and capital preservation." Defendants identified no change in Class Members' circumstances to justify their about face.

102.   In any case, the growth-oriented IPS governed Defendants' choice before September 2025. No later than 2020 or 2021, a prudent fiduciary would have noticed how badly the American Century TDFs had trailed their market-dominating peers over the prior decade. A prudent fiduciary would have concluded they failed to meet the IPS's stated goal.

103.   A reasonable fiduciary would also have periodically reviewed how the industry rated the American Century Trust TDFs.

104.   Morningstar provides insight into industry sentiment. It rates assets within various categories on a scale of one to five stars. Each Morningstar Category groups investments into peer categories based on similar risk, return, and behavior profiles. All Morningstar star ratings are backward-looking, risk-adjusted rankings of a fund relative to other funds in the same category. Funds are then ranked in their category on this risk-adjusted return; the top 10% get 5 stars, the next 22.5% get 4 stars, and the middle 35% get 3 stars, and so on.

105.   While Morningstar ratings have limitations,[14] a sub-par Morningstar rating would cause a reasonable fiduciary to scrutinize whether a fund should be replaced.

106.   By early 2021, several vintages of the American Century TDFs received sub-par Morningstar ratings. These laggards included vintage year 2030 (two stars), 2035 (three stars), 2045 (three stars), and 2055 vintages (three stars).

---

[14] For example, each Morningstar Category includes retail-class mutual funds. A retail-class fund may receive a high Morningstar rating even if institutional-class shares are available, in which case it would be imprudent for an ERISA fiduciary to select the retail shares. Despite these limitations, for a reasonable fiduciary a sub-par Morningstar rating would raise eyebrows.

30

107.    The same year, T. Rowe Price's TDFs received four or five stars from Morningstar for the same vintages (the 2030, 2035, 2045, and 2055).

108.    In 2021[15] and 2022,[16] Morningstar graded American Century's TDFs behind more than a dozen options, including the big five: T. Rowe Price, Vanguard, Fidelity, American Funds, and BlackRock. For both years, Morningstar estimated that each of the top five charged lower expense ratios than American Century.

109.    The American Century TDFs' ratings worsened after 2021. Most vintages fell to just one or two stars and have remained there ever since.

110.    The American Century 2035, 2040, 2045, 2050, 2055, 2060, and 2065 TDFs now average one-star ratings with Morningstar from a one-year, five-year, and ten-year lookback. While the 2030 variation has more often floated to two stars, it currently sits at one star:



111.     During the Class Period, T. Rowe Price, Vanguard, Fidelity, American Funds, and other providers received much higher ratings. This discrepancy would have been apparent to any reasonable fiduciary in 2021. Since then, the gap has only widened.

---

[15] https://www.morningstar.com/funds/best-target-date-funds-2021-beyond (identifying at least fifteen TDFs recommended ahead of American Century as of March 2021).

[16] https://www.morningstar.com/funds/best-target-date-funds-2022-beyond (identifying at least fifteen TDFs recommended ahead of American Century as of March 2022).

112.    By failing to remove the American Century TDFs until September 2025, Defendants breached their duty to prudently manage the Plans' investments.

**B.  Defendants Imprudently Select More Expensive Shares of Mutual Funds Over Less Expensive Shares or Collective Trusts.**

113.    Defendants' imprudence did not stop at choosing improper assets. They also violated their duty to "minimize costs" related to investment and "incur only costs that are reasonable." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016).

114.    Throughout the Class Period, Committee, Transamerica, and Creative chose more-expensive share classes of the American Century, PIMCO, and Janus Henderson Funds, despite the Plans qualifying for lower-priced shares.

115.    In administering a large ERISA plan, a prudent fiduciary understands that "[s]ome mutual funds offer investors different types of shares, known as 'classes.' Each class invests in the same portfolio of securities and has the same investment objectives and policies. But each class has different shareholder services and/or distribution arrangements, with different fees and expenses. Because of the different fees and expenses, each class will likely have different performance results."[17]

116.    A mutual fund's share classes are simply slices of the same mutual fund pie, but some slices cost more than others. This is because large institutional investors, like the Plans, are offered bulk discounts in the form of "institutional" share classes with lower per-unit costs.

117.    "This means that owning a different class of the same fund will result in different investment returns. The effect of different fees on different mutual fund share classes is

---

[17] https://www.investor.gov/introduction-investing/investing-basics/glossary/mutual-fund-classes.

compounded over time. * * * The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn – now and over time."[18]

118.    Except in unusual cases, it is grossly imprudent for a fiduciary to select higher cost shares of a mutual fund when lower cost shares of the same fund are available. *See Tibble v. Edison Int'l*, No. 07-cv-5359, 2017 WL 3523737, at *12 (C.D. Cal. Aug. 16, 2017) ("[N]o prudent fiduciary would purposefully invest in higher cost retail shares . . . . [A] prudent fiduciary would have invested in the lower-cost institutional-class shares.").

119.    The Committee, Transamerica, and Creative ignored their duty to avoid unnecessary costs. Throughout the Class Period, they chose the American Century TDFs' Class I shares over its cheaper Class R6 shares.

120.    The table below shows the difference between the net price of Class I and Class R6 shares, after accounting for fee waivers.[19] This data is taken from 2022 but is reflective of the typical price difference throughout the Class Period.

*American Century TDFs: Net Expense Ratio by Vintage Year (as of 2022).*

| Vintage | Class I Net Expense Ratio | Class R6 Net Expense Ratio |
|---|---|---|
| 2025 | 0.57% | 0.42% |
| 2030 | 0.59% | 0.44% |
| 2035 | 0.62% | 0.47% |
| 2040 | 0.64% | 0.49% |
| 2045 | 0.67% | 0.52% |
| 2050 | 0.69% | 0.54% |
| 2055 | 0.69% | 0.54% |

---

[18] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-61.

[19] During the Class Period, the American Century manager agreed to waive a portion of the manager fee from the expense ratio.

| 2060 | 0.69% | 0.54% |
|---|---|---|
| 2065 | 0.69% | 0.54% |
| In Retirement | 0.55% | 0.40% |

121.    Because the 403(b) Plan held substantial assets under management (over $496 million total and over $199 million in the American Century TDFs alone), the Plan qualified for the institutional share class with the lowest fees. By paying more for the same assets, Defendants foisted unnecessarily high fees onto Plaintiff and Class Members.

122.    Aside from cheaper share classes, American Century offered all of its TDFs in a lower-cost CIT vehicle. So too did most of its TDF competitors. The CIT version was used by other ERISA plans managed by Johns Hopkins affiliates. Yet Defendants chose to load up the Plans with the higher-priced, Class I mutual fund version of each TDF vintage.

123.    This unnecessary spending did not end with the American Century TDFs. Defendants repeated the same mistake when selecting other mutual funds.

124.    For both Plans, Defendants added retail Class A shares of the PIMCO Income Fund (expense ratio: 0.94%). This was imprudent because the same fund offered lower cost Institutional shares (expense ratio: 0.54%).

125.    For the Janus Henderson Triton Fund, Defendants chose the higher-priced Class T Shares (expense ratio: 0.91%), despite the availability of lower-priced Class N shares (expense ratio: 0.67%).

126.    Lastly, Defendants committed the same breach with the Invesco Developing Markets Fund. They picked this fund's higher-priced Class Y Shares (expense ratio: 1.05%) over its cheaper Class R6 shares (expense ratio: 0.88%).

34

127.    For each of these funds, Defendants chose higher-cost shares over "otherwise identical lower-cost institution[al]-class products," "needlessly elect[ing] to pay more for the same product when a lower bulk price was available." Lauren K. Valastro, *How Misapplying Twombly Erodes Retirement Funds*, 32 Geo. Mason L. Rev. 421, 458–59 (2025).

128.    These unnecessary costs created two distinct harms. "Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

129.    Defendants should be required to restore the Plans for both types of losses.

### C. Defendants Violate Their Duty of Loyalty and Engage in Party-in-Interest Transactions.

130.    Upon information and belief, Defendants retained the American Century TDFs and other costly mutual fund shares for self-interested motives. During the Class Period, the American Century TDFs, PIMCO fund, Janus Henderson Fund, and Invesco Fund all paid excessive revenue-sharing fees to National, the Plan's broker. National then transferred these fees to its affiliate, Transamerica, which served as the Plan's recordkeeper and investment manager.

131.    Based on All Children's 5500 filings, Transamerica and National acted as service providers to the Plans since the early 2010s.

132.    In 2016, the 403(b) Plan entered a new service agreement with Transamerica for investment management and RKA services.

133.    The new contract limited the 403(b) Plan's investment options to those offered on Transamerica's platform, including the American Century TDFs (Class I), the Janus Triton Fund (Class T) and the PIMCO Income Fund (Class A). It also spelled out the revenue sharing that certain mutual funds would kick back to Transamerica.

134. This agreement incentivized Transamerica to recommend retaining the American Century TDFs and other underperforming assets.

135. The Plans also paid direct fees to Transamerica that were more than reasonable compensation for its RKA services. The revenue-sharing fees acted as additional, less transparent income that did not correlate to a higher degree of work.

136. For ERISA plans, RKA has become a highly automated, digitized, and commodified industry. Due to the automated computer systems used for recordkeeping, recordkeepers primarily distinguish themselves on the basis of price rather than any special or unique benefits to plan participants. "Just as increased fees do not correlate to enhanced or improved services, they also do not correspond to value creation for 401(k) plan participants or reflect more work by the recordkeeper (again, with digital recordkeeping technology, services are automated)." Valastro, *Misapplying Twombly*, at 434–36.

137. By causing the Plans to enter these revenue sharing arrangements with Transamerica, National, and various mutual funds, Defendants violated ERISA Section 1106. This section forbids any transaction providing for "direct or indirect . . . furnishing of services . . . between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

138. This general bar is subject to an exception for transactions that are "necessary for the . . . operation of the plan," but only if "no more than reasonable compensation [was] paid." 29 U.S.C. § 1108(b)(2). It is the fiduciary's burden to prove these elements as an affirmative defense. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 702 (2025).

139. Defendants cannot prove the reasonability or necessity of the arrangements between National, Transamerica, and the mutual funds offered on Transamerica's platform. Those

funds include the American Century TDFs, the PIMCO Fund, the Janus Henderson Fund, and the Invesco Fund.

140.    By 2020, National and Transamerica extracted revenue-sharing fees from the 403(b) Plan's mutual funds on a scale that exceeded the total expense ratio of most other funds on the market. From the assets below, they collected:

- American Century TDFs - 0.42% of the 403(b) Plan's invested assets.
- PIMCO Fund - 1.26% of the 403(b) Plan's invested assets.
- Janus Henderson Fund - 0.90% of the 403(b) Plan's invested assets.
- Invesco Fund - 0.70% of the 403(b) Plan's invested assets.

*2020: Revenue Sharing Payments to National and Transamerica.*

**All Children's Health System, Inc. 403(b) Savings Plan**
**EIN No.: 59-2481740, Plan No. 003**
**Plan Year Ending: 12/31/2020**

Indirect Compensation in the form of revenue sharing was paid to the following Service Providers:

NATIONAL FINANCIAL SERVICES                    04-3523567

Revenue amounts are shown in annualized basis points of plan assets invested in applicable fund

| Fund Family | Fund Name | Start Date | End Date | Revenue to National Financial Services |
|---|---|---|---|---|
| AMERICAN BEACON | AMERICAN BEACON SMALL CAP VALUE R5 | 1/1/2020 | 12/31/2020 | 0.112 |
| AMERICAN CENTURY | AMERICAN CENTURY EQUITY INCOME R5 | 5/27/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2020 I | 1/1/2020 | 10/2/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2025 I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2030 I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2035 I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2040 I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2045 I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2050 I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2055 I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2060 I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE INCOME I | 1/1/2020 | 12/31/2020 | 0.420 |
| AMERICAN FUNDS | AMERICAN EUROPACIFIC GROWTH R5 | 1/1/2020 | 12/31/2020 | 0.140 |
| INVESCO | INVESCO DEVELOPING MARKETS Y | 1/1/2020 | 12/31/2020 | 0.700 |
| JANUS | JANUS HENDERSON TRITON T | 1/1/2020 | 12/31/2020 | 0.980 |
| MASS MUTUAL | MASSMUTUAL SELECT MID CAP GROWTH R5 | 1/1/2020 | 12/31/2020 | 0.420 |
| PIMCO | PIMCO INCOME FUND A | 1/1/2020 | 12/31/2020 | 1.260 |

141.    These payments far exceeded 0.37%, the average expense ratio charged by other TDFs in 2020.[20] As for mutual funds, no later than 2021, "the average expense ratio of actively managed equity mutual funds [in such plans] fell to 0.68 percent."[21]

142.    A review of the 403(b) Plan's 2024 filing shows an increase in these payments over time. The American Century One Choice TDFs now kick back 0.495% of invested assets to National, and the PIMCO Fund has increased its kickbacks to 1.485%.

---

[20] https://www.ici.org/system/files/attachments/pdf/per27-03.pdf.

[21] https://www.ici.org/system/files/2022-03/per28-02_2.pdf.

**Schedule C, Line 2(h) Formula Descriptions**

All Children's Health System, Inc. 403(b) Savings Plan
EIN No.: 59-2481740, Plan No. 003
Plan Year Ending: 12/31/2024

Indirect Compensation in the form of revenue sharing was paid to the following Service Providers:

NATIONAL FINANCIAL SERVICES                     04-3523567

Revenue amounts are shown in annualized basis points of plan assets invested in applicable fund

| Fund Family | Fund Name | Start Date | End Date | Revenue to National Financial Services |
|---|---|---|---|---|
| AMERICAN CENTURY | AMERICAN CENTURY EQUITY INCOME R5 | 1/1/2024 | 7/25/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2025 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2030 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2035 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2040 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2045 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2050 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2055 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2060 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE 2065 I | 1/1/2024 | 12/31/2024 | 0.495 |
| AMERICAN CENTURY | AMERICAN CENTURY ONE CHOICE INCOME I | 1/1/2024 | 12/31/2024 | 0.495 |
| FIDELITY | FIDELITY SMALL CAP VALUE | 1/1/2024 | 12/31/2024 | 0.825 |
| JANUS | JANUS HENDERSON TRITON T | 1/1/2024 | 12/31/2024 | 1.155 |
| MASS MUTUAL | MASSMUTUAL MID CAP GROWTH R5 | 1/1/2024 | 12/31/2024 | 0.495 |
| PIMCO | PIMCO INCOME FUND A | 1/1/2024 | 12/31/2024 | 1.485 |

143.    As the scale of these payments increased, average expense ratios for TDFs decreased to 0.29% of invested assets in similar ERISA plans. [22]

144.    There is no evidence that they performed any special work justifying these bloated fees. The Plans already paid direct fees to Transamerica that were in line with market rates for RKA and investment services.

145.    These revenue-sharing arrangements were also unnecessary because they violated Defendants' duty of impartiality. Under ERISA, "fiduciaries owe a duty to treat all participants and beneficiaries impartially." *Su v. RiversEdge Advanced Ret. Sols., LLC*, No. 2:24-cv-00104, 2024 WL 1193858, at *9 (W.D. Pa. Feb. 20, 2024) (internal citations omitted).

146.    Here, only some of the Plan's mutual fund options charged higher fees, a portion of which they passed on to Transamerica. As a result, "the relatively unsophisticated investors who choose . . . high-cost funds effectively subsidize the administrative expenses of plan participants

---

[22] https://www.ici.org/news-release/25-low-expense-ratios-benefit-retirement-savers#:~:text=The%20average%20expense%20ratio%20of%20target%20date%20mutual%20funds%2C%20an,Savings.

39

who opt into the low-cost options. . . . We see no normative justification for this cross-subsidization. . . . Why should unsophisticated investors fund the retirement accounts of workers with the sophistication to opt out of low-quality choices?" Ayres & Curtis, *Beyond Diversification*, 124 Yale L.J. at 1513.

147.    The impartiality problem was heightened as to the American Century TDFs. These funds served as the Plans' QDIA, so participants who did not choose their investments were automatically enrolled in them. There was no rational basis to place the burden of administrative costs on busy healthcare workers who chose the default option.

148.    In sum, Defendants violated their duty of loyalty by retaining underperforming assets that kicked back excess fees to insiders.

## **CLASS ACTION ALLEGATIONS**

149.    Plaintiff brings this action under Rule 23 on behalf of the Class Members and Plans. Plaintiff reserves the right to revise her class definitions and propose other or additional classes in subsequent pleadings or in a motion for class certification.

150.    Plaintiff brings this action on behalf of herself and the Class, which is defined as participants in and beneficiaries of the Plans who, within the statute of limitations period, invested in any of the challenged funds, but excluding the following: All Children's Committee members; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of All Children or is or was a partner, officer, director, or controlling person of All Children; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of All Children; Plaintiff's counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

151.    The Class Period is from the beginning of the applicable statute of limitations period to Plaintiff's claims through the date of judgment.

152.    Plaintiff asserts these Counts against Defendants on behalf of the Plans and, in acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plans.

153.    **Numerosity:** The Classes are so numerous that joinder of all Class members is impracticable. As of 2024, the Plan reported over 6,600 participants or beneficiaries with interests in the Plan.

154.    **Typicality:** Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is a current or former participant in the Plan who has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, in an omnibus account, so Defendants' imprudent decisions affected all Plan participants similarly. All Class members are beneficiaries of the same trust and use the same custodian and recordkeeping system managed by Transamerica.

155.    These mutual fund securities are not registered to or owned directly by Plan participants—unlike individual retirement accounts (IRAs). The Plan's trust(s) own the securities at issue and buy and sell them at an omnibus or net aggregate trust level, settling shares daily with the recordkeeper, Transamerica. It is Transamerica who updates individual participant account balances through daily valuation.

156.    Therefore, each All Children Plan participant or Class Member is a beneficiary of the same trust and participates through Transamerica, the common recordkeeper.

157.    Plaintiff's claims are typical of the claims of the Class. Plaintiff has no interests antagonistic to the Class, and questions of law and fact are common to Class members and predominate over any individualized questions. Plaintiff understands that this matter cannot be settled without Court approval.

158.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are aligned with those of the Class, and Plaintiff has retained counsel experienced in fiduciary investment mismanagement litigation and class actions. Plaintiff has no conflicts of interest that would impair their ability to represent the Class.

159.    **Commonality**: Common questions of law and fact predominate, including but not limited to:

   a.  Whether Defendants breached their duty of prudence by failing to adequately monitor and evaluate the Plans' investment options;

   b.  Whether Defendants failed to prudently monitor and remove imprudent Plan investments;

   c.  Whether All Children breached its duty to monitor its co-fiduciaries;

   d.  Whether the revenue-sharing fees paid to National were prohibited transactions;

   e.  Whether Defendants breached their duty to monitor Plan investments;

   f.  Whether Defendants failed to investigate and consider lower-cost, better-performing alternatives;

   g.  The proper measure of monetary relief; and

   h.  The proper form of equitable and injunctive relief.

160.    Under Fed. R. Civ. P. 23(b)(1)(A), class certification is proper because prosecuting separate actions against Defendants would create a substantial risk of inconsistent or varying adjudications, resulting in incompatible standards of conduct governing Defendants' fiduciary obligations. Absent class treatment, different courts could impose conflicting requirements on All Children's management and administration of the Plans.

161.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications as to individual Class members would, as a practical matter, be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect those interests. Any equitable relief ordered by the Court—such as the removal of imprudent Plan investments or fiduciaries—would necessarily affect the Plans as a whole. Likewise, the accounting for losses and restoration of Plan assets required under 29 U.S.C. §§ 1109 and 1132 would inure to the benefit of all participants, rendering individual actions impracticable.

162.    Class certification is further appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Defendants' conduct was uniform and affected all Class members in the same manner.

163.    Class members have little interest in pursuing separate actions against Defendants because the amount of each individual claim is relatively small compared to the expense and burden of individual litigation. Plaintiff is unaware of any similar individual actions brought by Class members asserting these claims.

164.    Class certification will also avoid duplicative litigation and reduce the risk of inconsistent or conflicting judgments concerning Defendants' fiduciary practices.

165.    Managing this action as a class action will not present any unusual or insurmountable difficulties, as the claims arise from common policies, practices, and fiduciary decisions applicable to the Plan as a whole.

166.    In the interests of justice and judicial efficiency, concentrating the litigation of all Class members' claims in a single forum is both desirable and appropriate.

**COUNT I**
**BREACH OF DUTY OF PRUDENCE**
**(Against the Committee, Transamerica, and Creative for Employing
an Imprudent Process to Select, Monitor, and Retain Investments)**
**29 U.S.C. § 1104(A)(1)(B)**

167.    Plaintiff incorporates by reference the allegations made in paragraphs 1-165.

168.    During the Class Period, Defendants the Committee, Transamerica, and Creative acted as fiduciaries of the Plans. Each exercised discretionary authority or control over Plan assets, including the Plan's investment menu.

169.    The Committee, Transamerica, and Creative breached their duty of prudence by:

- Selecting and retaining the American Century Trust TDFs despite persistent underperformance and higher cost relative to its peers, including all of the large target date providers.
- Failing to engage in a prudent process for evaluating Plan investments against meaningful benchmarks and peers, as further described in the class certification allegations; and
- Failing to monitor and remove imprudent Plan investments and replace them with better-performing, lower-cost alternatives.

170.    Based on Forms 5500 filed from 2015 to the present, the Plan's investment lineup reflects systemic process failures rather than isolated or reasonable fiduciary decisions.

171.    Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Defendants are liable to restore to the Plans all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

172.    On behalf of the Plan, Plaintiff also seeks appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

## COUNT II
## BREACH OF DUTY OF LOYALTY
### (Against the Committee, Transamerica, and Creative for
### Disloyal Motive in Retaining Investments)
### 29 U.S.C. § 1104(A)(1)(A)

173.    Plaintiff incorporates by reference the allegations made in paragraphs 1-165.

174.    As explained throughout the Complaint, Defendants chose to retain the American Century TDFs for a decade despite their incompatibility with the Plans' investment objective.

175.    It does not appear Defendants made this decision based on an assessment of the participants' time horizons, liquidity needs, or other circumstances.

176.    Under its 2016 contract with the Plans, Transamerica collected revenue-sharing fees as a result of the Plans' investments in the American Century TDFs. This arrangement gave Defendants an incentive to maintain the status quo.

177.    By allowing these motivations to cloud their judgment, Defendants failed to invest "for the exclusive purpose of" furthering participants' interests. 29 U.S.C. § 1104(A)(1)(A)

178.    Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Defendants are liable to restore to the Plans all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

179.    On behalf of the Plan, Plaintiff also seeks appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

## COUNT III
### BREACH OF DUTY OF PRUDENCE
### (Against the Committee, Transamerica, and Creative
### for Choosing More Expensive Share Classes of Mutual Funds)
### 29 U.S.C. § 1104(A)(1)(B)

180.    Plaintiff incorporates by reference the allegations made in paragraphs 1-165.

181.    During the Class Period, all Defendants were fiduciaries of the Plans.

182.    The Committee, Transamerica, and Creative breached their duty of prudence by selecting higher-cost shares of the American Century, PIMCO, Janus Henderson, and Invesco Funds when cheaper shares of the same mutual funds were available. And Defendants failed to take advantage of the American Century TDFs' lower-cost CIT variants, making the Plans pay more for the mutual fund versions.

183.    Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Defendants are liable to restore to the Plans all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

184.    On behalf of the Plan, Plaintiff also seeks appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

## COUNT IV
### BREACH OF DUTY OF PRUDENCE - FAILURE TO MONITOR
### (Against All Children for Failure to Monitor Other Defendants)
### 29 U.S.C. § 1104(A)(1)(B)

185.    Plaintiff incorporates by reference the allegations made in paragraphs 1-165.

46

186. During the Class Period, All Children was the plan administrator and acted as a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

187. All Children delegated its investment function to its internal Committee, along with Transamerica and Creative. As explained throughout the Complaint and in Counts I-III, these advisors acted recklessly in investing Plan assets.

188. Based on Forms 5500 filed from 2015 to the present, the Plan's investment lineup reflects systemic process failures rather than isolated or reasonable fiduciary decisions.

189. Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Defendants are liable to restore to the Plans all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

190. On behalf of the Plan, Plaintiff also seeks appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

## COUNT V
### PROHIBITED TRANSACTIONS WITH A PARTY-IN-INTEREST
(Against the Committee, Transamerica, and Creative for Selecting
Mutual Funds That Paid Excessive Revenue-Sharing Fees to National)
29 U.S.C. § 1106(a)(1)

191. Plaintiff incorporates by reference the allegations made in paragraphs 1-165.

192. As the Plan's securities broker, National was a party-in-interest to the Plans under ERISA.

193. Defendants allowed the Plan to select more expensive shares of the American Century, PIMCO, Janus Henderson, and Invesco Funds, when cheaper but otherwise identical shares were available. These funds then paid excessive revenue-sharing fees to National.

47

194.   These payments are prohibited transactions under ERISA Section 1106, which forbids "direct or indirect . . . furnishing of services. . . between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

195.   Defendants knew or should have known that National would receive excessive direct or indirect compensation from Plan assets, resulting in impermissible transfers of Plan assets to parties in interest.

196.   As a direct and proximate result of these prohibited transactions, the Plans paid excessive administrative and investment-related fees.

197.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plans and to disgorge all revenues received as a result of the prohibited transactions. Plaintiff also seeks appropriate equitable relief under 29 U.S.C. § 1132(a)(3).

198.   Plaintiff therefore seeks all remedies available to her, the Class Members, and the Plans to redress these prohibited transactions.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, requests that the Court enter judgment:

(1)   declaring that Defendants breached their duties as described above;

(2)   holding that Defendants are liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches;

(3)   determine the method by which Plan losses and fiduciary profits should be calculated, and order Defendants to provide all accountings necessary to determine the amounts they must make good to the Plans under 29 U.S.C. §1109(a);

(4)     hold that Defendants must disgorge all sums of money received from their use of assets of the Plans;

(5)     surcharge against All Children and in favor of the Plans all amounts involved in any transactions which an accounting reveals were improper, excessive and/or in violation of ERISA;

(6)     order equitable restitution against All Children;

(7)     certify the Class, appoint Plaintiff as the class representative, and appoint Plaintiff's Counsel as Lead Class Counsel;

(8)     award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

(9)     order the payment of interest to the extent it is allowed by law; and

(10)    grant other equitable or remedial relief as the Court deems appropriate.

June 18, 2026                                         Respectfully submitted,

                                                     /s/ Jimmy Mintz
                                                     Jimmy W. Mintz
                                                     Florida Bar No. 113363
                                                     Bryson Harris Suciu & DeMay, PLLC
                                                     201 Sevilla Avenue, 2nd Floor
                                                     Coral Gables, FL 33134
                                                     Tel.: (786) 879-8200
                                                     jmintz@brysonpllc.com

                                                     James R. DeMay*
                                                     Bryson Harris Suciu & DeMay, PLLC
                                                     900 W. Morgan St.
                                                     Raleigh, NC 27603
                                                     Tel.: (704) 941-4648
                                                     jdemay@brysonpllc.com

                                                     * Pro hac vice forthcoming